**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 24 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DUSTIN FARROW,

Defendant-Appellant.

No. 01-6105

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA.
(D.C. No. 00-CR-175-L)

---

Submitted on the briefs:

Robert G. McCampbell, United States Attorney, Timothy W. Ogilvie, Assistant
U.S. Attorney, Oklahoma City, Oklahoma, for Plaintiff-Appellee.

William P. Earley, Assistant Federal Public Defender, Oklahoma City, Oklahoma,
for Defendant-Appellant.

---

Before **TACHA** , Chief Judge,   **BALDOCK** , Circuit Judge, and   **BRORBY**  Senior
Circuit Judge.

---

**TACHA** , Chief Judge.

Defendant Dustin Farrow pled guilty to a one-count information charging him with bank robbery in violation of 18 U.S.C. § 2113(a). He was sentenced to sixty-three months in prison to be followed by a three-year term of supervised release. On appeal, Mr. Farrow complains that the district court erred in determining his sentence under the United States Sentencing Guidelines by finding him to have possessed a dangerous weapon during the robbery. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and we affirm. [1]

## I. Background

On October 30, 2000, Mr. Farrow approached the counter of a branch of the Bank of Oklahoma located inside a grocery store. When he reached the counter, he told the teller, "give me all the money, set it on the counter" and, "don't try anything funny. Don't make a scene or I'll do something reckless." R., Vol. 2, at 3. At the time, defendant's hand was in his pocket. The teller complied, and Mr. Farrow left with approximately $1,700.00.

After a swift investigation, the FBI confronted Mr. Farrow and questioned him about his role in the robbery. At that time, Mr. Farrow confessed to the robbery and, although he denied possessing a gun, he admitted "he did have his

---

[1] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

hand in his pocket as if he had one." *Id.* at 5. On December 12, 2000,

Mr. Farrow pled guilty to one count of bank robbery under 18 U.S.C. § 2113(a). [2]

Relying on the 2000 edition of the United States Sentencing Commission

Guidelines Manual (USSG or guidelines), the probation officer recommended a

base offense level of twenty for the robbery, and also recommended a three-level

upward adjustment pursuant to USSG § 2B3.1(b)(2)(E) because "the defendant

led the teller to believe he was in possession of a firearm during the course of

[the] robbery." R. Vol. 2 at 6. [3] The district court overruled Mr. Farrow's

objections to that enhancement and imposed the sentence based on the probation

officer's recommendations. In making its determination, the district court also

made specific reference to the 2000 guidelines, as well as to an amendment

contained in that version of the guidelines affecting the commentary to both

---

[2]     Title 18 U.S.C. § 2113(a) provides a maximum twenty-year sentence for "[w]hoever, by force and violence, or by intimidation, takes, or attempts to take . . . any property or money or any other thing of value [from] any bank." Subsection (d) enhances the statutory penalty by five years if, in committing an offense under § 2113(a), the accused "assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device." *Id.* § 2113(d).

[3]     Mr. Farrow's base offense level was also raised two levels for taking the property of a financial institution, USSG § 2B3.1(b)(1), but it was lowered a total of three levels for accepting responsibility for his offense under USSG § 3E1.1(a),(b)(2). Given this adjusted base offense level of 22, combined with his criminal history category IV, Mr. Farrow faced an imprisonment range of 63 to 78 months. Elimination of the three-level enhancement for possessing a dangerous weapon would lower Mr. Farrow's sentencing range to 46 to 57 months.

§ 2B3.1(b)(2)(E) (the specific offense characteristic guideline enhancement applied to Mr. Farrow) and § 1B1.1 (application instructions). That amendment, known as Amendment 601, became effective November 1, 2000, one day after Mr. Farrow committed the robbery, and altered the definition of "dangerous weapon" under that commentary. On appeal, Mr. Farrow argues the district court violated the Ex Post Facto Clause of the U.S. Constitution by applying the 2000 guidelines, as amended, to his offense. Additionally, Mr. Farrow claims the enhancement itself is unsupported by the evidence, arguing a concealed hand cannot be a "dangerous weapon" for purposes of the guidelines.

"We review the district court's legal interpretation and application of the guidelines de novo." *United States v. Henry,* 164 F.3d 1304, 1310 (10th Cir. 1999). However, "[w]e review factual findings underlying upward adjustments with deference, overturning them only upon a determination that the findings were clearly erroneous or without factual support in the record such that our review leaves us with the firm and definite conviction that a mistake has been made." *United States v. Pool,* 937 F.2d 1528, 1530 (10th Cir. 1991).

## II. Amendment 601

Under the 1998 version of the guidelines, the base offense level for robbery could be enhanced upon the application of the following specific offense characteristics:

> (A) If a firearm was discharged, increase by 7 levels; (B) if a firearm was otherwise used, increase by 6 levels; (C) if a firearm was brandished, displayed, or possessed, increase by 5 levels; (D) if a dangerous weapon was otherwise used, increase by 4 levels; (E) if a dangerous weapon was brandished, displayed, or possessed, increase by 3 levels; or (F) if a threat of death was made, increase by 2 levels.

USSG § 2B3.1(b)(2) (1998). Application note one under the commentary to that section states that the term "dangerous weapon" is defined in the commentary to USSG § 1B1.1 (application instructions). In 1998, that commentary defined a dangerous weapon as "an instrument capable of inflicting death or serious bodily injury. Where an object that appeared to be a dangerous weapon was brandished, displayed, or possessed, treat the object as a dangerous weapon." *Id.* § 1B1.1, cmt. n.1(d). In addition, application note two to the commentary under USSG § 2B3.1 reiterated the second line of that general definition stating that "[w]hen an object that appeared to be a dangerous weapon was brandished, displayed, or

possessed, treat the object as a dangerous weapon for the purposes of subsection (b)(2)(E)." *Id.* § 2B3.1, cmt. n.2 (1998).

Effective November 1, 2000, the commentary to both sections 1B1.1 and 2B3.1 was amended. Amendment 601 stated in pertinent part:

> The Commentary to § 1B1.1 captioned "Application Notes" is amended in Note 1 by striking subdivision (d) in its entirety and inserting the following: "(d) 'Dangerous weapon' means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument ( e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun)."
>
> . . . .
>
> The Commentary to § 2B3.1 captioned "Application Notes" is amended by striking Note 2 in its entirety and inserting the following: "2. Consistent with Application Note 1(d)(ii) of § 1B1.1 (Application Instructions), an object shall be considered to be a dangerous weapon for purposes of subsection (b)(2)(E) if (A) the object closely resembles an instrument capable of inflicting death or serious bodily injury; or (B) the defendant used the object in a manner that created the impression that the object was an instrument capable of inflicting death or serious bodily injury ( e.g., a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun)."

USSG App. C Supp., amend. 601 (2001).

In the section titled "Reason for Amendment," the Sentencing Commission wrote that the definition of "dangerous weapon" was amended

to clarify under what circumstances an object that is not an actual,

dangerous weapon should be treated as one for purposes of guideline application. The amendment is in accord with the decisions in United States v. Shores, 966 F.2d 1383 (11th Cir. 1992) (toy gun carried but never used by a defendant qualifies as a dangerous weapon because of its potential, if it were used, to arouse fear in victims and dangerous reactions by police or security personnel) and United States v. Dixon, 982 F.2d 116 (3d Cir. 1992) (hand wrapped in a towel qualifies as a dangerous weapon if the defendant's actions created the impression that the defendant possessed a dangerous weapon).

*Id.* at 75.

It is clear from the pre-sentence investigation report that the probation officer relied on the 2000 edition of the guidelines, as amended, in making his initial recommendation for a three-level enhancement for Mr. Farrow's possession of a dangerous weapon during the robbery. [4] Moreover, it is evident from the hearing transcript that the district court also considered Amendment 601 in determining that Mr. Farrow created the impression of possessing a dangerous weapon during the robbery. Mr. Farrow now argues that Amendment 601

---

[4] Paragraph 21 of the pre-sentence investigation report enhanced Mr. Farrow's base offense three levels under § 2B3.1(b)(2)(E) for possession of a "firearm." R., Vol. 2 at 6. While the probation officer's use of the term "firearm" is inconsistent with subsection (E) of § 2B3.1(b)(2) (which instead refers to a "dangerous weapon") the error was not prejudicial to Mr. Farrow, as the proper guideline subsection was cited and the appropriate three-level enhancement was ultimately applied. Furthermore, responding to Mr. Farrow's objections to the pre-sentence recommendations, the probation officer confined his analysis to the definition of "dangerous weapon" as applied to subsection (E), rather than to the technical definition of "firearm" in other guideline subsections. R., Vol. 2 at 17.

changed the substance of the guidelines such that the district court's application of it to him violated his constitutional rights.

### III. Ex Post Facto Claim

A defendant is ordinarily sentenced under the guidelines in effect on the date of sentencing. *United States v. Kissick,* 69 F.3d 1048, 1052 (10th Cir. 1995) (citing USSG § 1B1.11(a)). However, "'[i]f the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.'" *Id.* at n.1 (quoting USSG § 1B1.11(b)(1)). [5] To avoid ex post facto concerns, USSG § 1B1.11(b)(2) provides that "if a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes." *See also Kissick,* 69 F.3d at 1052 ("sentencing and reviewing courts may still give

---

[5] Article I of the United States Constitution provides that "no . . . ex post facto law shall be passed." U.S. Const. art. I, § 9, cl. 3. "[T]o fall within the *ex post facto* prohibition, two critical elements must be present: first, the law 'must be retrospective, that is, it must apply to events occurring before its enactment'; and second, 'it must disadvantage the offender affected by it.'" *Miller v. Florida,* 482 U.S. 423, 430 (1987) (quoting *Weaver v. Graham,* 450 U.S. 24, 29 (1981)). Furthermore, "no *ex post facto* violation occurs if a change does not alter 'substantial personal rights,' but merely changes 'modes of procedure which do not affect matters of substance.'" *Id.* (quoting *Dobbert v. Florida,* 432 U.S. 282, 293 (1977)).

retroactive effect to amendments that are 'clarifying (as opposed to substantive)'") (quoting *United States v. Capers,* 61 F.3d 1100, 1109 (4th Cir. 1995)). Mr. Farrow argues Amendment 601 makes substantive alterations to the 2000 version of the guidelines and claims the district court violated the Ex Post Facto Clause in applying that version to his disadvantage, rather than the 1998 guideline version that was in effect on the date of his offense. Therefore, we must decide whether Amendment 601 is "substantive" or merely "clarifying."

In making this determination, we have stated "[a] variety of factors may be considered, including the Commission's characterization of the amendment, whether the amendment changes the text of the guidelines or merely the accompanying commentary, and whether the amendment alters the controlling pre-amendment interpretation of the guideline at issue." *Kissick,* 69 F.3d at 1052. Here, the Commission's characterization of the amendment is that it "clarif[ies] under what circumstances an object that is not an actual, dangerous weapon should be treated as one for purposes of guideline application." USSG App. C Supp. at 75. This characterization, while entitled to deference, is not conclusive. *United States v. Mondaine,* 956 F.2d 939, 942 (10th Cir. 1992). However, the amendment also did not change the text of the guidelines, but merely changed the accompanying commentary. Both the pre-amendment and amended text of the robbery guideline provided for a three-level enhancement for possessing a

dangerous weapon. Furthermore, prior to Amendment 601 the comments to both USSG §§ 2B3.1 and 1B1.1 already directed sentencing courts to treat objects as dangerous weapons based on their appearance as instruments capable of inflicting death or serious bodily injury.

As to the third factor, "this Circuit has held that an amendment that effectively overrules existing precedent should be classified as substantive rather than clarifying." *Kissick,* 69 F.3d 1048, 1053 (citing *United States v. Saucedo,* 950 F.2d 1508, 1514 (10th Cir. 1991), *overruled on other grounds, Stinson v. United States,* 508 U.S. 36 (1993)). This is not the case here because Amendment 601 does not compel this court to overrule existing circuit precedent in order to interpret it consistently with the amended commentary. *See Mondaine,* 956 F.2d at 942. Indeed, although sparse, our cases interpreting the relevant guideline definitions of "dangerous weapon" are in accord with the amendment's clarification. *See, e.g., Pool,* 937 F.2d 1528, 1530-31 (toy cap gun possessed during robbery was a dangerous weapon for purposes of § 2B3.1); *United States v. Tissnolthtos,* 115 F.3d 759, 763 (10th Cir. 1997) (piece of firewood qualifies as a dangerous weapon for purposes of § 1B1.1; "'[C]ourts have found that, in the proper circumstances, almost anything can count as a dangerous weapon, including walking sticks, leather straps, rakes, tennis shoes, rubber boots, dogs,

rings, concrete curbs, clothes irons, and stink bombs.'" (alteration in original) (quoting *United States v. Dayea,* 32 F.3d 1377, 1379 (9th Cir. 1994))).

Moreover, Amendment 601 is neither impermissibly retrospective nor disadvantageous as applied to Mr. Farrow in this case. For purposes of the Ex Post Facto Clause, "[a] law is retrospective if it 'changes the legal consequences of acts completed before its effective date.'" *Miller,* 482 U.S. at 430 (quoting *Weaver,* 450 U.S. at 31). Yet, Amendment 601 does not impose a greater punishment by merely clarifying the definition of "dangerous weapon." Even before the effective date of the amendment, a defendant convicted of robbery could receive a three-level enhancement to his sentence if he was found by a preponderance of the evidence to have possessed an object that appeared capable of inflicting death or serious bodily injury. This is still the case under the amended guideline. The Supreme Court instructs us that "[i]t is axiomatic that for a law to be *ex post facto* it must be more onerous than the prior law." *Dobbert,* 432 U.S. at 294. However, Amendment 601 does not affect "[t]he crime for which the present defendant was indicted, the punishment prescribed therefor, [or] the quantity or the degree of proof necessary to establish his guilt." *Id.* (quoting *Hopt v. Utah,* 110 U.S. 574, 589-90 (1884)). Therefore, we hold Amendment 601 merely clarifies Application Note 1(d) of USSG § 1B1.1 and Application Note 2 of USSG § 2B3.1, and the district court's reliance upon the

amended commentary in determining Mr. Farrow's sentence did not violate the Ex Post Facto Clause of the United States Constitution.

## IV. Possession of a Dangerous Weapon

Mr. Farrow next argues that under either the 1998 or the amended 2000 version of USSG § 2B3.1(b)(2), there is insufficient evidence to support a three-level upward adjustment in his base offense level. Specifically, he argues "the application of the adjustment requires, at a minimum, the perpetrator have in his possession an 'object.' Moreover, that 'object' must, at a minimum, be capable of creating the appearance of a gun." Aplt. Br. at 11. Consequently, Mr. Farrow argues that his hand, placed in his pocket so as to give the impression that he possessed a dangerous weapon during the robbery, cannot be an object sufficient to trigger the upward adjustment. We agree with Mr. Farrow that, under both versions of the guidelines, the plain language of the commentary to USSG §§ 2B3.1 and 1B1.1 necessarily requires some "object" to support a finding of possession of a dangerous weapon. Nevertheless, we do not accept his conclusion that a concealed hand can never be that object.

Given the definition of "dangerous weapon," as that term is clarified by Amendment 601, it is unmistakable that the United States Sentencing Commission intends a more expansive reading of the word "object" than Mr. Farrow urges in this appeal. Since 1989, when the Commission first defined "dangerous weapon"

to include objects even if they only *appeared* capable of inflicting death or serious bodily injury, [6] this circuit and others have interpreted the term broadly. *See, e.g., Pool,* 937 F.2d at 1531 n.1 ("[a]lthough the gun carried by [defendant] was a plastic gun, the Sentencing Guidelines indicate that an object that appeared to be a dangerous weapon [should be treated] as a dangerous weapon") (alteration in original) (quotation omitted); *accord United States v. Taylor,* 960 F.2d 115, 116 (9th Cir. 1992) (appearance of bulge under defendant's shirt resembling outline of a gun was a dangerous weapon); *United States v. Matthews,* 20 F.3d 538, 553-54 (2d Cir. 1994) (toy gun properly treated as a dangerous weapon under the guidelines); *United States v. Woodard,* 24 F.3d 872, 873-74 (6th Cir. 1994) ("a toy, which looked like a real gun, could be a dangerous weapon"); *United States v. Hart,* 226 F.3d 602, 608-09 (7th Cir. 2000) (shoe box and lunch box portrayed as bombs considered dangerous weapons under sentencing guidelines); *United States v. Michael,* 220 F.3d 1075, 1076 (9th Cir. 2000) (cellular phone was dangerous weapon within meaning of sentencing guidelines).

---

[6]  Before November 1, 1989, the definition of a dangerous weapon was limited to "an instrument capable of inflicting death or serious bodily injury." USSG § 1B1.1, cmt. n.1(d) (1988).  Amendment 71 to the guidelines added the language "[w]here an object that appeared to be a dangerous weapon was brandished, displayed, or possessed, treat the object as a dangerous weapon." USSG App. C, amend. 71 (effective Nov. 1, 1989).  Amendment 110 added the same language to § 2B3.1, USSG App C Supp., amend. 110 (effective Nov. 1, 1989).

The Third Circuit was the first to consider whether a hand could be an object for purposes of the definition of the term "dangerous weapon" under the guidelines. In *Dixon,* 982 F.2d 116, the court affirmed a three-level enhancement of a bank robber's sentence under § 2B3.1 where the robber's accomplice had a towel over her hand in a manner perceived by bank employees to be concealing a gun. In that case, the court held that the covered hand was an "object" and that "[t]he object that was her hand, together with the object covering it, the towel, appeared to [the bank tellers] to be a weapon." *Id.* at 122. Since then, the Eleventh Circuit has held "that a 3 level enhancement is proper when a robber uses a finger or some other hard object to cause the victim to believe that it is a dangerous weapon." *United States v. Vincent,* 121 F.3d 1451, 1455 (11th Cir. 1997).

Finally, the Fourth Circuit has also held that "a concealed hand may serve as an object that appears to be a dangerous weapon." *United States v. Souther,* 221 F.3d 626, 629 (4th Cir. 2000), *cert. denied*, 531 U.S. 1099 (2001). In *Souther,* the defendant did not possess an actual weapon, but he gave bank tellers notes stating he had a gun and he kept his hands in his coat pockets most of the time during two robberies. In agreeing with the Third and Eleventh Circuits, the court stated:

> In *Vincent,* the concealed hand appeared to be a dangerous weapon because it was pressed into the victim's side. In *Dixon,* the

concealed hand appeared to be a dangerous weapon because it was draped with a towel. In the instant case, the concealed hand appeared to be a dangerous weapon because Souther presented a note that stated he had a gun.

. . . .

The instant case presents a twist, however, in that the hand was not given the visual appearance of a gun ( *e.g.*, Souther did not extend his finger inside his pocket in order to make his hand look like a gun). Neither did Souther wave his concealed hand around or press it into someone's side. Nevertheless, we decline to restrict the meaning of the word "appear" to visual or sensorial appearances. Souther's hand appeared to be a dangerous weapon because it was concealed in his coat pocket and because he told the teller via the note that he possessed a gun.

*Id.* at 629-30.

Cases applying a less restrictive approach in determining what object can appropriately be considered a "dangerous weapon" under the guidelines are uniformly predicated on the underlying policy that even the perception of a dangerous weapon has the potential to add significantly to the danger of injury or death. As stated by the Third Circuit:

Even though [the bank robber] did not possess an actual weapon underneath the concealing towel, her actions created a reasonable belief that she had a gun. Police responding to the crime or the victims of the crime could easily have retaliated violently because of the immediate threat they perceived. During the course of a robbery, people confronted with what they believe to be a dangerous weapon often find their perception impaired because of fear and the threat of violence. That perceived fear and threat can itself trigger a violent and even deadly response.

-15-

*Dixon*, 982 F.2d at 124; *see also Vincent*, 121 F.3d at 1455 ("We agree with the Third Circuit that the danger of a violent response that can flow from pretending to brandish, display, or possess a simulated weapon in perpetrating a robbery is just as real whether the object is a toy gun, or a concealed body part"); *Souther*, 221 F.3d at 631 ("The risks created by [defendant] when he stated that he had a gun and kept his hand concealed in his pocket are the same as the risks created by a robber who possesses a toy gun or who simulates a gun with a concealed body part.").

This policy is compelling, and it is not eroded by subsequent amendment to the guidelines that now defines an object as a dangerous weapon if it "closely resembles" an instrument capable of inflicting serious injury or death or if it is used "in a manner that created the impression that the object was such an instrument." USSG § 1B1.1, cmt. n.1(d) (2001). Therefore, we conclude that a concealed hand may be an object which potentially triggers the three-level enhancement under § 2B3.1(b)(2)(E).

We now turn to the facts of this particular case to determine whether Mr. Farrow's concealed hand either closely resembled or created the impression of a dangerous weapon. The district court found that Mr. Farrow's hand did, indeed, create that impression and we will overturn that finding only if it is

clearly erroneous. *See United States v. Archuletta,* 231 F.3d 682, 684 (10th Cir. 2000).

Mr. Farrow argues that the district court, in addressing this question, improperly used a subjective standard for assessing the evidence, looking only to the perception of the victim-teller to determine whether Mr. Farrow possessed a dangerous weapon. Mr. Farrow cites the Seventh Circuit's decision in *Hart,* urging us to adopt an objective standard which would inquire "whether a reasonable person, under the circumstances of the robbery, would have regarded the object that the defendant brandished, displayed or possessed as a dangerous weapon." *Hart,* 226 F.3d at 607. We find merit in this argument, as we are aware that certain boundaries must be drawn to ensure that innocent conduct is not punished due solely to potentially unreasonable perceptions of particular victims. Thus, we agree with the Seventh Circuit that "[a]lthough the victim's perception of the object may be relevant to [the factual] inquiry, her subjective state of mind is never controlling of the outcome." [7] *Id.* Nevertheless, even using this standard, the evidence in this case clearly supports the enhancement.

---

[7] Such a standard, combining objective and subjective factors, is consistent with our standard to determine whether the evidence is sufficient to support a finding of "intimidation" for purposes of the underlying robbery statute. *See United States v. Mitchell,* 113 F.3d 1528, 1531 (10th Cir. 1997) ("we look to three factors: (1) whether the situation appeared dangerous, (2) whether the defendant intended to intimidate, and (3) whether the bank personnel were reasonable in their fear of death or injury").

Contrary to Mr. Farrow's arguments, the district court did not make its findings solely on the basis of the teller's observation. Instead, the court applied the three-level enhancement to Mr. Farrow based on his actions and language at the scene, which included demands for money and threats. Moreover, the court also considered Mr. Farrow's admission to FBI investigators that "he did not have a gun, but did have his hand in his pocket as if he had one." R., Vol. 2 at 5. These facts satisfy us that the district court assessed the evidence in light of the proper standard and that its findings were not based solely on the victim's subjective perception. These findings are adequately supported in the record, and we conclude that they are not clearly erroneous.

## V. Double Counting Claim

Finally, in arguing that the facts do not support an upward adjustment for possession of a dangerous weapon, Mr. Farrow also claims the application of the sentence enhancement to his base offense level for robbery has resulted in impermissible double counting. We disagree. Section 2113(a) of Title 18 of the United States Code punishes anyone who, "by force and violence, or by intimidation, takes . . . money or any other thing of value belonging to . . . any bank . . . ." An enhancement based on possession of a dangerous weapon under 2B3.1(b)(2)(E) does not result in double counting because possession of a dangerous weapon is not an element of the offense of unarmed robbery under the

-18-

statute. *Compare* 18 U.S.C. § 2113(a) *with* 18 U.S.C. § 2113(d); *see also United States v. Rose,* 731 F.2d 1337, 1348 (8th Cir. 1984). We also find no force in Mr. Farrow's argument that robbery under § 2113(a) necessarily encompasses the enhancement for possession of a dangerous weapon if that enhancement is based solely upon a defendant's "words and actions." If those actions include creating an impression of possessing a dangerous weapon, as is the case with Mr. Farrow, the enhancement accounts for an entirely separate harm and is proper. *See United States v. Rucker,* 178 F.3d 1369, 1373 (10th Cir. 1999) (no improper double counting of separate enhancement provisions when they "do not necessarily overlap, are not indistinct, and do not serve identical purposes") (emphasis omitted).

The judgment of the United States District Court for the Western District of Oklahoma is AFFIRMED.